O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ROBERTO MONCADA,

    Plaintiff,

   v.

ANTONY BLINKEN, in his official capacity as U.S. Secretary of State,

    Defendants.

Case No.  CV 19-01293-AB

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TRIAL DATE: September 28, 2022**

   This matter was tried before this Court, sitting without a jury, on September 28, 2022.

   Robert G. Berke and Carlo Brooks appeared on behalf of Plaintiff Roberto Moncada.  Ruth Ann Mueller and Angel Martinez appeared on behalf of Defendant, Antony Blinken, in his official capacity as United States Secretary of State.

   Having heard the admissible evidence presented by the parties, the arguments of counsel, and having considered the demeanor and credibility of the witness and all papers and exhibits presented by the parties for purposes of this trial, the Court makes

the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## **Introduction**

Mr. Moncada has lived his entire life as a United States citizen because the United States government told Mr. Moncada that he was a citizen.  And then they told him again.  (*See e.g.*, Dkt. No. 125, Stipulated Fact ("SF") 7.)  And again.  (*Id.*)  And again. (*Id.*)  And again.  (*Id.*)

Indeed, on multiple occasions, the government sought to answer precisely the same question animating this litigation:  What was Mr. Moncada's father's diplomatic status at the time of Mr. Moncada's birth?  And on multiple occasions, the government determined that because Dr. Moncada did not have full diplomatic immunity at the time of his son's birth, "Roberto Moncada would therefore have acquired U.S. citizenship at birth."  (Ex. 29 at DEF-00000018.)

However, on July 27, 2018, the government finally (and somewhat curiously) stumbled across its mistake, and Mr. Moncada—two years shy of 70—received a letter revoking his passport and, in effect, his citizenship.

At trial, the government categorized its near seventy-year error as "a very unfortunate and regrettable situation" telling the Court that "[w]e do not hide the fact that this is unfortunate, this is regrettable, but there were mistakes that were made . . .

these are unfortunate administrative errors. . ."  (Tr. at 176:16-20.)   The "unfortunate

and regrettable" defense is not one that the Court has ever known the government to

accept from a Defendant.  But for Mr. Moncada, apparently, it will have to do.

The Court is unable to grant the relief Mr. Moncada seeks because it is

constrained by the applicable law, as set forth below.  The government, though, is not.


**FINDINGS OF FACT**

**A.     The United States Mission to the United Nations**

1.     The United States Mission to the United Nations ("USUN") is the U.S.

permanent mission that represents the United States at the United Nations.  (*See* Tr.

12:11-13, 14:20-25.)

2.     The USUN is "its own entity under the Department of State."  (*Id.* at

53:19-54:4) (Donovan).

3.     A permanent mission to the United Nations is a diplomatic mission in

New York that houses the diplomatic delegation of a member state to the United

Nations.  (*Id.* at 109:17-19; Dkt. No. 143-1 at 3 ¶ 8.)

4.     James B. Donovan serves as the Minister Counselor for Host Country

Affairs Section at USUN ("Minister Counselor").  The Host Country Affairs Section

is charged with "[a] variety of responsibilities that pertain to the obligations that the

U.S. has to the United Nations and that are spelled out in the UN headquarters

agreement that the United States signed with the United Nations . . . in 1947 as host

country of the United Nations."  (*Id.* at 12:11-13, 13:10-14) (Donovan).

5.     "Minister Counselor" is "a diplomatic label for a position within the

mission."  (*Id.* at 12:17) (Donovan).

6.     Minister Counselor Donovan has held his position since 2012.  (Tr. 13:7-8) (Donovan).

7.     The Court found Minister Counselor Donovan to be a credible witness.

8.     One of Minister Counselor Donovan's primary responsibilities is "to register [the foreign diplomats who come to serve their countries at their missions to the United Nations] . . . and accredit them and recognize those that are eligible with privileges and immunities." (*Id.* at 13:15-19) (Donovan).

9.     The office of Host Country Affairs "exist[s] to support the foreign diplomats in a variety of ways." (*Id.* at 13:21-22) (Donovan).

10.     The *only* office at the U.S. Mission that affords privileges and immunities to U.N. diplomats is the office of Host Country Affairs.  (*Id.* at 14:22-25.)

11.     There are no other offices within the U.S. government that afford privileges and immunities to diplomats "of other countries of the United Nations that are posted to the United States." (*Id.* at 15:1-5) (Donovan).

12.     Employees at the USUN are Department of State employees and report "to the ambassadors who are representing and serving at the [USUN]." (*Id.* at 50:17-20) (Donovan).

13.     Presently, if questions arise regarding an individual's diplomatic privileges and immunities, such questions are referred to Minister Counselor Donovan because it is his responsibility "to review and analyze these cases." (*Id.* at 15:19-16:1) (Donovan).

14.     Minister Counselor Donovan worked directly on determining whether Plaintiff's father, Dr. Jose Maria Moncada, had diplomatic privileges and immunities at the time of Plaintiff's birth.  (*Id.* at 16:2-5.)

**B.     The Process for Recognizing Diplomats with Full Diplomatic Privileges and Immunities**

15.     There are—both today and at the time of Plaintiff's birth—two levels of diplomatic immunity that are granted by the USUN: (1) Full Diplomatic Privileges

and Immunities; and (2) Official Acts Immunities.  An individual who serves his or her mission in an administrative capacity—including, for instance, as a chauffeur or a chef—is entitled to "official acts immunities."  Such an individual would possess immunity only for actions that flow from their employment responsibilities and *would not* be entitled to full diplomatic privileges and immunities.  Conversely, an individual who serves his or her mission in a diplomatic capacity *would be* entitled to full diplomatic privileges and immunities and thus would *not* be subject to the jurisdiction of the United States.  (*Id.* at 58:8-59:5) (Donovan).

16.    The Host Country Affairs Section has a process for recognizing diplomats with full diplomatic privileges and immunities and creating internal records documenting such privileges and immunities.  This process is substantively the same today—accounting for changes in technology—as it was at the time of Plaintiff's birth.  (*Id.* at 24:16-18, 34:4-16, 112:15-22) (Donovan).

17.    Information that was once contained in a paper file called a "KARDEX" is now retained in a computerized database called "TOMIS."  (*Id.* at 22:15-18; 112:20-22.)

18.    Before a diplomatic family arrives in the United States, their respective mission typically would "communicate via diplomatic note to the Office of UN Protocol the name of the diplomat, the diplomatic title, the work that [the diplomat is] going to be doing at the mission, as well as any family members . . . [and this information] would all be sent by diplomatic note to the UN Office of Protocol, which would then . . . verify [the information.]"  (*Id.* at 32:7-15) (Donovan).

19.    The U.N. reviews this information and "has to check a few boxes" to determine whether a given individual is entitled to full diplomatic privileges and immunities.  Namely, the UN determines whether the individual has a diplomatic title and whether the individual will, in fact, be doing diplomatic work.  (Tr. at 54:21-24) (Donovan).

20.     After this verification takes place, the U.N. Office of Protocol sends the relevant information to the USUN with two requests: (1) A request to register the individual; and (2) a request for recognition with privileges and immunities, if there is a determination that "it's a diplomatic person." (*Id.* at 32:16-20) (Donovan).

21.     Before the implementation of the TOMIS system, this registration was memorialized in a physical paper index card called a KARDEX.  KARDEX cards included the following information: "[T]he name of the diplomat, their rank, their diplomatic title . . . the country [the diplomat was] serving from, and then any family members who were notified to [the USUN]." (*Id.* at 22:15-22) (Donovan).

22.     KARDEX cards were created for each diplomat and filed in alphabetical order in a card catalog file that still exists at the USUN Office, with records dating back to 1947. (*Id.* at 29:20-24) (Donovan).

23.     Typically, because all members of a diplomatic household are recognized with full privileges and immunities, the USUN "would want the entire family to be listed" on the KARDEX. (*Id.* at 35:1-4) (Donovan).

24.     Often times, however, KARDEX cards were not updated to reflect the birth of a child into a diplomatic household because, *inter alia*, the respective mission did not report the birth to the USUN. (*Id.* at 35:15-19) (Donovan).

25.     Whether or not an individual family member's name was listed on the KARDEX card had no bearing on "the level of privileges and immunities" that they possessed at that time. (*Id.* at 31:10-14, 35:23-36:1) (Donovan).

26.     As noted *supra*, today, information previously recorded through KARDEX is now collected in a computerized database called TOMIS.  TOMIS accomplishes "virtually the same [purpose as the KARDEX system], only it's done in the computer world instead of on a piece of paper." (*Id.* at 112:15-22, 72:12-13) (Donovan).

27.     "The USUN Blue List contains members of delegations to the United Nations entitled to diplomatic privileges and immunities." (*Id.* at 24:7-9) (Donovan).

6.

28.     The USUN Blue List *does not* contain the names of individuals who possess only official acts immunity: "And we do not keep a list of those who have official acts immunity.  It's only those who have full privileges and immunities."  (*Id.* at 67:14-18) (Donovan).

29.     In addition, the USUN Blue List contains the name of the diplomat's spouse.  It does not contain the names of a diplomat's children: "[G]oing back all the way to 1947, the records only include the principal diplomat and then the spouse." (*Id.* at 24:10-13, 16-18) (Donovan).

30.     As noted *supra*, an individual's name would *not* be contained on the USUN Blue List unless that individual had been afforded full diplomatic agent-level privileges and immunities by the USUN. (*Id.* at 24:19-23) (Donovan).

31.     More precisely, if an individual's name is contained on the USUN Blue List for a given month, this constitutes "airtight" evidence that the named individual possessed full diplomatic agent-level privileges and immunities at that time.  Thus, the most significant document that can be reviewed to determine whether an individual possessed diplomatic agent-level privileges and immunities is the USUN Blue List for the corresponding time.  (*Id.* at 29:6-9, 45:12-16) (Donovan).

## C.     The Diplomatic Status of Dr. Moncada at the time of Plaintiffs Birth

### *i.     Defendant's Evidence that Dr. Moncada possessed full diplomatic privileges and immunities at the time of Plaintiff's birth*

32.     Plaintiff Roberto Moncada was born in New York City on July 6, 1950, to Dr. Jose Maria Moncada ("Plaintiff's father" or "Dr. Moncada") and Ms. Blanca Morales ("Plaintiff's Mother" or "Ms. Morales").  (Dkt. No. 125, SF 3; Ex. 12 (Birth Certificate.))

33.     At the time of Plaintiff's birth, neither Dr. Moncada nor Ms. Morales were citizens of the United States.  (*See* Ex. 19 (Dr. Moncada's U.S. Visa Application); Ex. 12 (Information Sheet); SF 9-10.)

34.     At the time of Plaintiff's birth, Dr. Moncada and Ms. Morales had three other children: Jose Maria; Horacio; and Marlene.  (*See* Ex. 2, "KARDEX.")

35.     As noted *supra*, where, as here, there are unresolved questions about an individual's diplomatic privileges and immunities, Minister Counselor Donovan is charged with reviewing and analyzing the relevant information alongside his staff. (Tr. 15:19-16:5) (Donovan).

36.     The first time Minister Counselor Donovan learned of Plaintiff was "at some point in 2018" after a staff member raised "the issue of whether Dr. Moncada would have had privilege and immunities during the time . . . that he was in New York serving his mission to the UN." (*Id.* at 16:20-17:8-18) (Donovan).

37.     Later that year, Minister Counselor Donovan determined that Dr. Moncada possessed privileges and immunities at the time of Plaintiff's birth.  (*Id.* at 17:22-18:1) (Donovan).

38.     On July 27, 2018, Defendant revoked Plaintiff's passport pursuant to 22 C.F.R. § 51.62(b), which states that "[t]he Department may revoke a passport when the Department has determined that the bearer of the passport is not a U.S. national, or the Department is on notice that the bearer's certificate of citizenship or certificate of naturalization has been cancelled."  (SF 14; 22 C.F.R. § 51.62(b.).)

39.     "The July 27, 2018 letter from the Department of State referenced 'Department records' purportedly showing that Plaintiff's father was serving as the 'Attaché to the Permanent Mission of Nicaragua to the United Nations' at the time of Plaintiff's birth.  The letter concluded on this basis that Dr. Jose Maria Moncada and 'the family members forming his household, including [Plaintiff], were accorded diplomatic agent level immunity pursuant to the United Nations Headquarters Agreement,' and accordingly Plaintiff was 'not born subject to the jurisdiction of the United States and [he] did not acquire U.S. citizenship by virtue of [his] birth here' and, as a result, is 'not entitled to hold a U.S. passport and [his] passport is revoked.'" (SF 15 (quoting Compl. Ex. A. at 10.))

40.    "On October 25, 2018, Plaintiff, by and through counsel, wrote a letter to the Office of Legal Affairs of the U.S. Department of State requesting that the Department of State reconsider its adverse action of July 27, 2018."  (SF 16.)

41.    "On November 28, 2018, Christine L. McLean, Division Chief of Legal Affairs, replied to Plaintiff's reconsideration request.  Ms. McLean reiterated that Plaintiff's passport was revoked because the 'Department determined that he is not a U.S. national.'"  (SF 17.)

42.    In 2020, Minister Counselor Donovan was asked "by the legal adviser's office to put together a certification based on the information that [his office] had uncovered in 2018."  (Tr. at 48:19-23) (Donovan).

43.    On April 14, 2020, Minister Counselor Donovan and the Host Country Affairs Section certified that: "The official records of the Host Country Affairs Section of the U.S Mission indicate that Dr. Jose Maria Moncada was appointed as Attaché to the Nicaraguan Mission to the United Nations on April 27, 1950, and together with other family members forming his household, began to enjoy diplomatic agent level privileges and immunities on April 27, 1950.  On March 18, 1955, the United Nations provided the U.S. Mission with official notification of Dr. Moncada's termination from the Nicaraguan Mission.  Dr. Moncada and his family enjoyed diplomatic agent level immunity until March 18, 1955."   (Ex. 1, "Certification Letter.")

44.    In making this certification, Minister Counselor Donovan reviewed, *inter alia*, the USUN Blue Lists; the KARDEX; and "two corroborating documents which are summaries of meeting in the general assembly where [Dr. Moncada] represented Nicaragua discussing substantive matters that would have been discussed by diplomats."  (Tr. at 22:5-23, 71:13-17) (Donovan).

45.    Minister Counselor Donovan stated that the most important official records that he reviewed were the USUN Blue Lists: "The most important [official record] was the diplomatic list—the U.S. Missions, diplomatic list for diplomats

9.

assigned to their respective missions to the United Nations who we have recognized with full privileges and immunities." (*Id.* at 22:7-11) (Donovan).

46.    Minister Counselor Donovan stated that "[w]e had these documents [the USUN Blue Lists] going all the way back to 1947 when the U.N. was created and our office was created." (*Id.* at 22:11-13) (Donovan).

47.    Minister Counselor Donovan stated that the USUN Blue List is "extremely controlling" and "airtight" evidence that a listed individual possessed full diplomatic privileges and immunities. (*Id.* at 29:6-8, 119:3-6) (Donovan).

48.    Minister Counselor Donovan stated that "in the time that [he has] work[ed] in the office, [he does not] recall a time that [the USUN] had to change our recognition of somebody who had immunity that was on the [USUN Blue] list unless they depart or unless they change jobs." (*Id.* at 119:7-10) (Donovan).

49.    As noted *supra*, the USUN Blue List does not contain—and the Host Country Affairs Section does not keep—a list of individuals who have been afforded only official acts immunity. (Tr. 67:16-18) (Donovan).

50.    Dr. Moncada served as a consul for the Nicaraguan Consulate in New York City at least as early as May 26, 1949. (*See* Ex. 23 at 44.[1])

51.    On May 26, 1949, President Harry Truman issued an Exequatur to Plaintiff's father in recognition of his appointment as "Consul of Nicaragua at New York, New York." (Ex. 15.)

52.    A certificate recognizing Plaintiff's father as Deputy Consul of Nicaragua was signed by the Mayor of New York City, William O'Dwyer. (Ex. 16.)

53.    A United Nations document entitled "Permanent Missions and Delegations to the United Nations" lists Dr. Moncada as both "Consul, New York" and "Attaché." (Ex. 13 at 2.)

---

[1] The listed page number refers to the page of the PDF in which the citation appears on the Trial Exhibit, not the page numbering on the bottom of the document itself.

54.     The  document contains the names of two other individuals under the heading of Nicaragua.  Dr. José Sanson Teran is listed as the "First Secretary of Embassy, Secretary-General" and Dr. Guillermo Sevilla-Sacasa is listed as "Ambassador Extraordinary and Plenipotentiary to the United States of America, Permanent Representative to the United Nations, Representative to the Interim Committee." (*Id.*)

55.     The document does not list Dr. Moncada's wife but appears to list the spouses of other individuals, including Dr. Sevilla-Sacasa.  (*Id.*)

56.     Plaintiff's birth certificate lists Dr. Moncada's "Usual Occupation" as "Deputy Consul" at the "Nicaragun Consul."  (Ex. 12, "Birth Certificate.")

57.     Dr. Moncada appears in the June 1950 USUN Blue List; the July 1950 USUN Blue List; and the August 1950 USUN Blue List.  (Exs. 3, 4, 5.)

58.     Because Plaintiff was born on July 6, 1950, Dr. Moncada thus appears in the USUN Blue List for the month immediately preceding Plaintiff's birth, the month of Plaintiff's birth, and the month immediately following Plaintiff's birth.

59.     Dr. Moncada is listed as an Attaché in the June, 1950; July, 1950; and August, 1950 USUN Blue Lists.  (Exs. 3, 4, 5.)

60.     An Attaché is a diplomatic title afforded to an individual with full diplomatic privileges and immunities.  It is "pretty clear and well-recognized in the diplomatic [world] as a very specific title of individuals who do . . . diplomatic work in the diplomatic world."  (Tr. at 26:15-19, 62:16-19) (Donovan).

61.     The USUN Blue Lists for June, July, and August of 1950 state that: "The persons listed herein are recognized by the Department of State as entitled to diplomatic privileges and immunities in the territory of the United States under the provisions of Section 15 of the Headquarters Agreement between the United States and the United Nations. (Public Law 357-80th Congress).  Identification cards have been issued by the Department to the Delegation Officers listed."  (Exs. 3, 4, 5.)

11.

62.     The "diplomatic privileges and immunities" referred to in the USUN Blue Lists are understood to confer "full privileges and immunities." (*Id.* at 70:11-71:11) (Donovan).

63.     Dr. Moncada addressed the United Nations General Assembly Fifth Session ("UNGA") on October 4, 1950.  According to the Official Records memorializing this 240th meeting, Dr. Moncada stated that: "[H]is delegation was gratified at the work done by the Secretary General in connexion with the 1951 budget estimates; it counselled the utmost caution in proceeding with the proposed reductions in the budget for 1951.  It was not necessary to be an expert economist to appreciate the good work carried out by the United Nations with the funds placed at its disposal.  The essential work of the United Nations was to maintain peace, and therefore every effort should be made to strengthen the machinery at its disposal and to encourage the Secretariat." (Ex. 7 at Def-00000043 at ¶ 33.)

64.     Dr. Moncada further "emphasized that Member States should not allow the United Nations to be weakened in the present difficult times.  If the United Nations did not receive sufficient funds its efforts would naturally be restricted and its staff [would] become discontented and corrupt." (*Id.* at ¶34.)

65.     Dr. Moncada argued: "Aggression was the real reason for the expansion of the budget of the United Nations.  As long as there was ill-will in the world and countries were armed to the teeth for the purpose of stirring up trouble and fomenting wars, the United Nations should be given all the necessary funds, resources, and staff to curb aggression." (*Id.* ¶35.)

66.     Dr. Moncada concluded that: "He hoped the time would come when in addition to increasing the budget of the United Nations the various Member States would be in a position to contribute funds for the founding of United Nations universities devoted to the peaceful uses of science and the arts." (*Id.* at DEF-00000044 at ¶36.)

67.     Dr. Moncada again addressed the UNGA Fifth Session on December 5, 1950.  According to the Official Records memorializing this 275th Meeting, Dr. Moncada: "[T]ook the opportunity to point out that the principle of equitable geographical distribution was not fully applied in the Secretariat.  There was not a single national of his country employed by the United Nations."  (Ex. 8 at DEF-00000050 at ¶57.)

68.     At both UNGA Meetings in which Dr. Moncada addressed the General Assembly, "he represented Nicaragua discussing substantive matters that would have been discussed by diplomats."  Dr. Moncada's participation in both UNGA Meetings signifies what would be "considered diplomatic work" consistent with his repeated inclusion on the USUN Blue List.  (Tr. at 71:13-17) (Donovan).

69.     The Yearbook of the United Nations for the year 1950 ("Yearbook") "presents the record of the [United Nations] during 1950."  The Yearbook lists Guillermo Sevilla-Sacasa as Nicaragua's representative to the U.N. and lists Colonel Carlos Eddie Monterey and Diego Manuel Chamorro as "Alternates."  It makes no reference to Dr. Moncada.  (*See* Ex. 25 Part 1 at 4, 49.)

70.     The Yearbook is not authoritative and has no bearing on whether the USUN affords full diplomatic privileges and immunities to a given individual.  (Tr. 76:7-18.) (Donovan)  ("[W]hat the UN publishes would have absolutely no bearing on [USUN's] determination in terms of recognition of full privileges and immunities because the United Nations does not determine that recognition of full privileges and immunities.'); *id* at 84:7-9 ("[T]he yearbook has absolutely no impact on our determination as to whether a diplomat is eligible for diplomatic privileges and immunities.") (Donovan).

71.     This is because the United Nations "does not have the authority to determine who is recognized with immunity and who isn't."  (Tr. 78:18-20, 80:3-6) (Donovan); (*see generally* Ex. 25).

13.

72.    On April 27, 1950, the Host Country Affairs Section received "Notification from U.N." regarding Dr. Moncada and his family.  This means that the USUN was informed that "this diplomatic family had arrived" with a request to register Dr. Moncada and his family.  (Tr. 33:11-15) (Donovan); (Ex. 2).

73.    A document titled "Permanent Delegation of Nicaragua to the United Nations" dated April 30, 1950, contains the "request for registration [for Dr. Moncada] coming . . . from the United Nations Office of Protocol back in April of 1950 . . . to the [USUN]."  The document lists Dr. Moncada's Title as "Attaché."  (Tr. 38:22-25) (Donovan); (Ex. 6).

74.    This Request was approved on May 5, 1950 and an Identification Card was issued to Dr. Moncada on May 9, 1950.  (Ex. 2)

75.    USUN was not able to locate in its records the request for privileges and immunities that, as noted *supra*, a matter of practice, would have come after the request for registration.  (Tr. 82:15-17) (Donovan).  As Plaintiff avers, "[t]here is no record—paper or electronic—of a request for privileges and immunities for Plaintiff's father."  (Dkt. No. 144-1 at 8 ¶ 26.)

76.    The Court credits Minister Counselor Donovan's testimony that because Dr. Moncada "was listed on the blue list of diplomats . . . for as many years as he [was], we would have received a request for diplomatic privileges and immunities. Otherwise, [USUN] wouldn't have included him on [the blue] list."  (Tr. 82:22-83:1) (Donovan).

77.    Put more precisely, the Court credits Minister Counselor Donovan's conclusion that a request for diplomatic privileges and immunities for Dr. Moncada was received by USUN despite the fact that USUN was unable to produce that request more than seventy years later.

78.    At some point thereafter, a KARDEX was created for Dr. Moncada.  The KARDEX likewise lists Dr. Moncada's Title as "Attaché."  (Ex. 2.)

79.     The KARDEX lists Dr. Moncada's wife, Blanca, and his three children at the time: Jose Maria, Horacio, and Marlene, as well as his Aunt, "Sra. Juana M. Cuadra." (Ex. 2.)

80.     The KARDEX was updated on October 31, 1952, to reflect a change in Dr. Moncada's "Residence Address." This change supports Minister Counselor Donovan's conclusion that the KARDEX was not made in error. (*Id*.)

81.     Plaintiff is not listed on the KARDEX. This is likely because Plaintiff had not been born at the time that it was created. (*Id*.; Tr. 35:9-12.) ("[I]t seems to me that, when the KARDEX was originally created . . . that [Plaintiff] had not yet been born. So he would not have been included.") (Donovan).

82.     The KARDEX was not updated to reflect Plaintiff's birth. As noted *supra*, this fact has no bearing on whether Plaintiff had full privileges and immunities at the time of his birth. (Tr. 31:10-15, 35:23-36:1) (Donovan).

83.     On March 18, 1955, the U.N. Office of Protocol "provided the U.S. Mission with official notification of Dr. Moncada's termination from the Nicaraguan Mission." (Ex. 1, 2; Tr. 21:17-20) (Donovan).

84.     This termination notice is reflected in the KARDEX. (Ex. 2.)

85.     Dr. Moncada served as both Deputy Consul, which affords only official acts immunity, and Attaché, which affords full diplomatic privileges and immunities. (Tr. 125:9-23, 126:3-8) (Donovan).

86.     Dr. Moncada served as Attaché at the time of Plaintiff's birth. (*See e.g.*, Exs. 3-5.)

87.     Dr. Moncada thus possessed full diplomatic privileges and immunities from April 27, 1950, until March 18, 1955. (Exs. 1-5.)

88.     Dr. Moncada thus possessed full diplomatic privileges and immunities at the time of Plaintiff's birth.

### *ii. Past Determinations Regarding Plaintiff's Citizenship*

89.     Minister Counselor Donovan's determination that Dr. Moncada possessed full diplomatic privileges and immunities at the time of Plaintiff's birth is contrary to past determinations—both implicit and explicit—that he did not.

90.     "The U.S. Department of State issued Plaintiff U.S. passport books in or around June 15, 1955; January 29, 1973; July 3, 1978; and October 6, 1999; and a passport card in or around May 19, 2010, in connection with which he subscribed the oath of allegiance." (SF  7.)

91.     "On November 20, 1978, Plaintiff submitted a Form I-130, Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa, on behalf of his father, Dr. Jose Maria Moncada, to the Immigration and Naturalization Service ('INS.')" (SF 8.)

92.     "On October 25, 1979, a consular officer issued Dr. Jose Maria Moncada an immigrant visa." (SF 9.)

93.     "On November 2, 1979, the United States admitted Dr. Jose Maria Moncada as a permanent resident." (SF 10.)

94.     "On or about June 3, 1997, Plaintiff submitted a Form I-130, Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa, on behalf of his then spouse, Manuela Navarro-Ramirez, to the INS, on the basis of [Plaintiff's] U.S. citizenship." (SF 11.)

95.     On April 26, 2001, Department of State Branch Chief of Information Services Hugh Howard sent a letter to the INS to confirm that Plaintiff's father's name did not appear in the "Department of State Diplomatic Lists." (SF 12; Dkt. No. 147-1.)

96.     "On May 2, 2021, INS approved the Form I-130 referenced in Paragraph [94] above." (SF 13.)

97.     Plaintiff's State Department Passport File demonstrates that on multiple occasions, individuals at the State Department inquired into Plaintiff's citizenship

status.  On each occasion, it was determined that Plaintiff was a United States citizen.  (*See generally* Ex. 29.)

98.     For instance, in 1978, the State Department endeavored to answer the very question animating this litigation: Did Dr. Moncada possess full diplomatic privileges and immunities at the time of Plaintiff's birth?  It determined that he did not and thus that Plaintiff was a United States citizen.  The same conclusion is implicit in the issuance of *five* passport books and passport cards to Plaintiff over a 55-year period.  (*See generally* Ex. 29, SF 7.)

99.     A telegram was sent in November of 1978 from "AMEBASSY MANAGUA" to "SECSTATE WASHDC 9171."  The Subject Line is "Verification of Citizenship."  The telegram reads as follows:  "Roberto Moncada.  DPOB, July 6, 1950, New York, New Yrok [sic], has filed resident Visa Petitions for several family members based on his having been born a U.S. Citizen.  He was issued a U.S. Passport in the U.S.  We notice, however, that on his birth certificate his father is listed as a Deputy Consul [w]ho worked in the Nicaraguan Consulate.  Was Passport Office aware of this?  Is it possible that father was working in consulate and was not on Blue List/before we proceed further with the case, we would like to be sure that Moncada was not registered as U.S. citizen by mistake."  (Ex. 29 at DEF-00000020.)

100.   A Department of State "Memorandum of Conversation" that was drafted on December 7, 1978 reads as follows:[2] Subject: Roberto Moncado [sic] Participants: Mr. ██ and Ms. ██ Protocol 20291 "Informed by Ms. ██ that name of subject's father does *not* repeat *not* appear on blue list as person possessing Diplomatic status at time of subject's bieth [sic] at New York, New York on Jult [sic] 6, 1950.  (Ex. 29 at Def-00000019) (Emphasis added.)

101.   On  December 8, 1978, a telegram with the subject line "U.S. Citizenship" was sent.  The telegram reads as follows: "1. Protocol Office reports that

---

[2] Redactions are replicated as they appear in the Trial Exhibits.

name of Moncada's father does *not* repeat *not* appear on blue list as person possessing diplomatic immunity status at time of birth of Roberto Moncada at New York, New York on July 6, 1950.  Roberto Moncada would therefore have acquired U.S. Citizenship at birth. YY."  (Ex. 29 at Def-00000017-18.) (Emphasis added.)

102.  On April 26, 2001, a letter was sent from Hugh Howard, the "Branch Chief, [of] Information Services" at the Ralph J. Bunche Library housed within the Department of State to "Mr. Shimizu" an employee at Immigration and Naturalization Services (the "Shimizu Letter").  The Shimizu Letter states as follows: "As we discussed on the telephone on April 25, 2001, I have searched the Department of State Diplomatic List for 1949 and 1950 and have been unable to find any entries for Jose Maria Moncada or Jose Maria Moncada Lezama of the Embassy of Nicaragua.  I have photocopied several entries and have included these in my fax, but you will see that the Nicaraguan mission remained fairly stable over that period." (Dkt. No. 147-1 at 1, DEF 00000058.)

103.  The Shimizu Letter attached several entries from the Department of State Diplomatic List ("State Department Blue List") between 1949 and 1950.  Dr. Moncada's name is not included.  (*Id.* at DEF 00000059-62.)

104.  Past inquiries into Dr. Moncada's diplomatic status led to repeated determinations that Dr. Moncada *did not* possess full diplomatic privileges and immunities at the time of Plaintiff's birth (or at any other time.)  Considered against the backdrop of Minister Counselor's Certification to the contrary and, more importantly, the evidence bolstering that certification, this reveals a staggering breakdown in (and failure of) governmental procedures.

105.  These failures do not, however, discredit the evidence before the Court demonstrating that Dr. Moncada possessed diplomatic immunity at the time of Plaintiff's birth.

106.  The Court concludes that (1) at no point prior to 2018 did an individual charged with determining Dr. Moncada's diplomatic status consult the USUN Blue

List; and (2) at no point in time did the USUN erroneously determine that Dr. Moncada did not possess full diplomatic privileges and immunities.

107.   Minister Counselor Donovan testified that the past inquiries likely relied on information that Dr. Moncada's name was not on the State Department's Diplomatic List, colloquially known as the State Department Blue List:  "[T]his letter states that [Dr. Moncada] was not on the State Department's Diplomatic List for the embassy, but we have the separate [USUN Blue List] diplomatic list for the U.N. Missions." (Tr. at 93:8-10) (Donovan).  Though the Court cannot, with certainty, make findings of fact regarding what occurred in 1978 and 2001, the Court concludes that it is exceedingly likely that individuals tasked with determining Dr. Moncada's diplomatic status referenced the State Department Blue List instead of the USUN Blue List.

108.   The State Department Blue List contains the names of individuals who have been afforded diplomatic agent level privileges and immunities at bilateral missions to the United States, such as Nicaragua's embassy in Washington, D.C.  (Tr. 53:15-18; 120:21-122:25) (Donovan).

109.   The State Department Blue List *does not* contain the names of individuals who are members of foreign missions to the United Nations.  Thus, it does not contain the names of individuals to whom the United States afforded diplomatic agent level privileges and immunities as a result of their accreditation to a foreign mission to the United Nations.  (*Id.* at 111:11-16) (Donovan).

110.   In its closing argument, the Court asked the government, "What is your response . . . to that exhibit that suggests somebody else looked at a blue list and came out with a different conclusion?"  (*See e.g.* Ex. 29 at Def-0000017) ("Protocol Office Reports That Name of Moncada's Father Does Not Repeat Not Appear on Blue List As Person Possessing Diplomatic Immunity Status At Time Of Birth of Roberto Moncada. . .").  (*See also* Dkt. No. 147-1.)  The government replied: "[Our] response would be just as Minister Counselor Donovan testified . . . that that blue list most

19.

likely was a State Department blue list and Mr. Moncada's father wouldn't be in that list." (Tr. at 166:15-21.)  The Court credits Minister Counselor Donovan's (and the government's) explanation that Dr. Moncada would not have been on the State Department Blue List because Dr. Moncada was not assigned to the Nicaraguan Embassy.  (Tr. 138:16-21.)  The Court thus accepts and adopts Minister Counselor Donovan's conclusion that Dr. Moncada's absence from the State Department Blue List is irrelevant to the question of whether Dr. Moncada enjoyed full privileges and immunities at the time of Plaintiff's birth.

111.   Because the individuals charged with determining Dr. Moncada's diplomatic status did not check the USUN Blue List, it is necessarily true that they were either unaware of its existence or indifferent to the crucial distinctions between the USUN Blue List and the State Department Blue List.  Because the government repeatedly looked at the wrong evidence, it repeatedly got the wrong result.  However, as stated *supra*, the government's past failures do not implicate the credibility of the evidence that is now before the Court—namely, the testimony of Minister Counselor Donovan[3], the USUN Blue Lists, the KARDEX, and the UNGA records demonstrating that Dr. Moncada twice addressed the UNGA in a manner consistent with an individual performing diplomatic work.

112.   Any Finding of Fact which is properly deemed a Conclusion of Law shall be considered a Conclusion of Law.

## CONCLUSIONS OF LAW

**A.     Alien Determinations Under 8 U.S.C. § 1503(a)**

113.   Title 8, United States Code, section 1503(a) states that "[i]f any person who is within the United States claims a right or privilege as a national of the United

---

[3] The Court in no way intends to impugn the character or competency of Minister Counselor Donovan nor his office.  To the contrary, Minister Counselor Donovan performed his job and did precisely what he is charged with doing.  It is clear that others, in the past, did not.

States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28 against the head of such department or independent agency for a judgment declaring him to be a national of the United States . . ."  8 U.S.C. § 1503(a)

114.   "Plaintiff seeks a Declaratory Judgment from this Court that he is a U.S. Citizen by birth and an order compelling the Department of State to reopen and approve his application for a U.S. passport pursuant to 8 U.S.C. §1503(a)."  (Dkt. No. 144-1 at 15 ¶ 1.)

115.   A lawsuit brought under §1503(a) is "not one for judicial review of the agency's action.  Rather, section 1503(a) authorizes a *de novo* judicial determination of the status of the plaintiff as a United States national."  *Richards v. Secretary of State, Dep't of State*, 752 F.2d 1413, 1417 (9th Cir. 1985).

116.   In an alienage determination under §1503(a), the Plaintiff bears the initial burden of producing "substantial credible evidence" of his citizenship claim. *Mondaca-Vega v. Lynch*, 808 F.3d 413, 419 (9th Cir. 2015).

117.   This threshold showing is minimal.  In *L. Xia v. Tillerson*, 865 F.3d 643, 656 (D.C. Cir. 2017), the United States Court of Appeals for the District of Columbia Circuit held that "[p]resenting proof of a naturalization certificate or passport—even if already administratively cancelled—would seem to satisfy that *prima facie* requirement."

118.   In *Mondaca-Vega*, the Ninth Circuit held that because the petitioner "possessed a valid U.S. passport and successfully petitioned for the adjustment of status of his wife and children based on his purported status as a U.S. citizen[]" he had put forth "substantial credible evidence of U.S. citizenship."  808 F.3d at 419 (cleaned up).

21.

119.   If the plaintiff satisfies his burden to rebut a presumption of alienage, the "burden shifts back to the government to prove . . . [that the plaintiff is not a citizen by] clear and convincing evidence." *Id.* (cleaned up).

120.   "[T]he power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers." *I.N.S. v. Pangilinan*, 486 U.S. 875, 883-84 (1988) (citing 28 U.S.C. §§ 1361, 1651.)

121.   This means that "[o]nce it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship." *Id.* at 884 (quoting *Fedorenko v. United States*, 449 U.S. 490, 517, (1981).

122.   In sum, "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.* at 885.  Thus, the Department of State's prior issuance of a passport—if issued in error—is not determinative of (nor can it confer) citizenship.

123.   The Constitution vests with the President the sole power to receive Ambassadors and other public Ministers.  U.S. Const. Art. II, § 1, ("The executive power shall be vested in a President of the United States of America.").  *Id.* § 3 ("[The President] shall receive Ambassadors and other public Ministers.").

124.   "The Reception Clause recognizes the President's authority to determine the status of diplomats, a fact long confirmed by all three branches." *Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) (cleaned up).

125.   As a result, "courts have afforded conclusive weight to the Executive's determination of an individual's diplomatic status." *Id.*  The Supreme Court has instructed that courts may not "sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister. . ." *In re Baiz*, 135 U.S. 403, 432 (1890)

126.   The State Department's certification "is the best evidence to prove the diplomatic character of a person accredited as a minister by the government of the United States" *Id.* at 421.

127.   Some Courts, including the District of Columbia Circuit and the United States Court of Appeals for the Fourth Circuit, have interpreted *In re Baiz* to hold that the State Department's formal certification of an individual's diplomatic status is conclusive, dispositive evidence that ends the judicial inquiry—so long as that determination is based on a reasonable interpretation of the Vienna Convention.  *See e.g., Muthana,* 985 F.3d at 906  ("In light of more than a century of binding precedent that places the State Department's formal certification of diplomatic status beyond judicial scrutiny, we conclude the certification is conclusive and dispositive evidence as to the timing of Muthana's diplomatic immunity."); *United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) (criminal conviction) ("[W]e hold that the State Department's certification, which is based upon a reasonable interpretation of the Vienna Convention, is conclusive evidence as to the diplomatic status of an individual."); *Carrera v. Carrera*, 174 F.2d 496 (D.C. Cir. 1949) (family law suit); *Abdulaziz v. Metropolitan Dade Cty.*, 741 F.2d 1328 (11th Cir. 1984) (section 1983 civil action).

128.   The government has not cited—and this Court has not identified—a case from the Ninth Circuit holding that *In re Baiz* dictates that the State Department's certification ends the inquiry, so long as it is based on a reasonable interpretation of the Vienna Convention.  In this Court's prior Order denying, *inter alia*, the Government's Motion for Summary Judgment, the undersigned determined that: "[Several out-of-circuit] persuasive authorities [cited by the government] are further distinguishable [from the facts before this Court] because they involve individuals seeking to invoke (not reject) diplomatic immunity in non-immigration contexts— here, Plaintiff rejects any claim of immunity for himself and Dr. Moncada."  (Dkt. No.

84 at 14:7-9.)  *Muthana*, though, had not been decided at the time of this Court's Order and it is beyond dispute that *Muthana*, like this instant matter, involves an individual seeking to reject diplomatic immunity in an immigration context.

129.   However, *Muthana* is, of course, not binding on district courts within the Ninth Circuit and the Court stands by its prior conclusion: "[T]reating the Government's certification as conclusive here would allow the Government unbridled freedom to modify an individual's immigration status and retroactively justify that decision based on a judicially nonreviewable, conclusive certification despite any and all competing evidence.  In short, such an approach would potentially render the Government immune from suit under 8 U.S.C. § 1503(a) by virtue of a nonreviewable certification [in any case that was even slightly rooted in a question of diplomatic immunity."] (*Id.* at 14:10-17.)

130.   The Court concludes that the Secretary's Certification—assuming it is based on a reasonable interpretation of the Vienna Convention—is highly persuasive evidence of an individual's diplomatic status.  It does not, however, mandate that the Court must then close its eyes to the entire body of evidence that is before it.

131.   The Court concludes that the 1978 Telegram to the Office of Protocol stating that Dr. Moncada "does not appear . . .  on blue list" is not a formal certification."  (Ex. 29 at DEF 00000017; *see also* Ex. 29 at 18-20; Tr. 18-8:11.)  Though certainly relevant to the Court's inquiry, the Telegram was an internal communication focused on clarifying Dr. Moncada's diplomatic status, not a formal certification prepared in order to aid a judicial review of citizenship.  It does not "appear on the letterhead of the United States Mission, carry the United States seal, and bear the signature of the Minister Counselor for Host Country Affairs." *Muthana*, 985 F.3d at 912 (Tatel, J., concurring).  Nor does it contain the words: "This is to *certify that . . .*"  *Id.*  This is because it was not authored by the Minister Counselor

and there is no evidence to support the proposition that it was authored by an individual with the authority to prepare a formal certification.

132.   The Court likewise concludes that the Shimizu Letter is not a "formal certification."  Here, too, there is no evidence to suggest that the author of the letter, Hugh Howard, possessed the authority to submit a formal certification; the letter represented an internal communication; the letter contains no indication that it was a formal (or informal) USUN Certification; and the letter was not authored by a USUN employee, let alone the Minister Counselor.

133.   The Court concludes that the April 14, 2020 letter authored by Minister Counselor Donovan is a "formal certification."  (Ex. 1.)

134.   Plaintiff has satisfied his initial burden of producing "substantial credible evidence" of his citizenship claim.  *Mondaca-Vega*, 808 F.3d at 419.  Specifically, Plaintiff has satisfied his burden through the following evidence: (1) the December 1978 Telegram, *see* Ex. 29 at DEF 00000017-19; (2) the Shimizu Letter, *see* Dkt. No. 147 at DEF 00000058; and (3) the U.S. passport books and passport card issued to Plaintiff on five occasions, *see* SF 7; Ex. 29.

135.   Defendant, though, has satisfied its corresponding burden to demonstrate by clear and convincing evidence that Plaintiff is not a U.S. citizen.  In reaching this decision, the Court relies on the following evidence that Dr. Moncada enjoyed full diplomatic privileges and immunities at the time of Plaintiff's birth:

136.   (1) The USUN's Certification prepared by Minister Counselor Donovan.  As noted *supra*, the Court does not believe that Minister Donovan's Certification is dispositive evidence that ends its inquiry.  However, the Court finds that Minister Counselor Donovan's Certification is based on a reasonable interpretation of the Vienna Convention and, given his expertise and credibility at trial, the Court affords the Certification considerable weight.  The Court rejects Plaintiff's argument that Minister Counselor Donovan's Certification is not based on a reasonable interpretation of the Vienna Convention.  Plaintiff argues that "the evidence here

25.

strongly suggests that Dr. Moncada's function was performing administrative functions and duties as a consular employee in connection with his government's representation to the U.N." (Dkt. No. 127 ("Pl. Tr Brief") at 4:15-18.) Plaintiff argues further that because Nicaragua's request for privileges and immunities is absent, there is "no evidence indicating that Dr. Moncada's duties were that of a 'diplomatic agent'" consistent with Article 29 of the Vienna Convention. (Dkt. No. 144-1 at 32 ¶ 41.) Plaintiff is correct that "[u]nder Article 37 of the VCDR, 'Members of the administrative and technical staff of a diplomatic mission [enjoy] less extensive immunity than that of diplomatic agents.'" (Dkt. No. 127 at 4:19-22.) However, the Court finds by clear and convincing evidence that Dr. Moncada performed functions consistent with a  diplomatic agent, not a member of the administrative and technical staff of the Nicaraguan Mission. (*See e.g. supra* ¶¶ 63-68; Exs. 6-8.)

137.   (2)  The USUN Blue List for June 1950, July 1950, and August 1950. The Court credits Minister Counselor Donovan's representations that Dr. Moncada's presence on the USUN Blue Lists for the months before, during, and after Plaintiff's birth constitutes "airtight" and "extremely controlling" evidence that Dr. Moncada enjoyed full privileges and immunities at the time each list was created. (Tr. at 29:8, 119:3-5.)

138.   (3) Dr. Moncada's KARDEX, which (1) lists his title as Attaché and (2) was updated to reflect a change in his Residence Address. (Ex. 2.)

139.   (4) The records demonstrating that Dr. Moncada addressed the UNGA on two occasions—October 4, 1950 and December 5, 1950—in a manner consistent with "diplomatic work" that would not be delegated to an individual without diplomatic agent level immunity. (Ex. 7 at Def-00000043-44, Ex. 8 At DEF-00000050.)

140.   As discussed *supra*, the Court concludes that Plaintiff's evidence to the contrary— namely, the 1978 Telegram, the Shimizu Letter, and the repeated renewal of Plaintiff's passport—collectively demonstrate a significant breakdown in governmental procedures that spanned multiple decades. However, the Court is

1    unable to conclude that these failures discredit the clear and convincing evidence that

2    Dr. Moncada enjoyed diplomatic agent level privileges and immunities at the time of

3    Plaintiff's birth.

4         141.   Plaintiff's additional evidence to the contrary—namely, Dr. Moncada's

5    absence from the UN Yearbook and the government's inability to locate the request

6    for privileges and immunities—is similarly unavailing.  As to the former, and as noted

7    *supra*, the Court credits Minister Counselor Donovan's representation that the

8    Yearbook has no bearing on USUN's determination regarding the recognition of full

9    privileges and immunities.  (*See* Tr. at 76:7-18, 84:7-9.)  And as to the latter, and as

10   noted *supra*, the Court credits Minister Counselor Donovan's testimony that Dr.

11   Moncada would not have been (repeatedly) included on the USUN Blue List in the

12   absence of a request for privileges and immunities.  The fact that the USUN was

13   unable to locate this request more than seventy years after the fact does not persuade

14   the Court that a request was never made.  This conclusion is bolstered by the entire

15   body of evidence before the Court.

16        142.   Finally, the evidence suggesting that Dr. Moncada served a concurrent

17   role as a Deputy Consul—(*see* Tr. 101:20-34)—does not undermine the evidence that

18   Dr. Moncada possessed diplomatic agent level privileges and immunities as a result of

19   his role as Attaché.  As the government concedes, "[a]bsent a special agreement

20   otherwise, an individual functioning solely as a consular official enjoys immunity

21   only for his official acts. . ."  (Dkt. 143-1 at 36  ¶44.)  However, there exists clear and

22   convincing evidence that Plaintiff's father also served as Attaché at the time of

23   Plaintiff's birth, and it is through this role that he received full diplomatic privileges

24   and immunities.

25        143.   The Court does not find Plaintiff's speculative alternative hypothesis that

26   Plaintiff's father was merely appointed to address the UN as a "nondiplomat"

27   plausible.  In a vacuum, it is theoretically possible that a nondiplomat could have

28   gained approval to address the UNGA on "an occasion or two."  (Tr. at 71:18-23.)

But here, too, Plaintiff's position does not square with the entire body of evidence before the Court.  To accept Plaintiff's proposition, the Court would have to ignore Dr. Moncada's repeated presence on the USUN Blue List—a list that includes *only* those individuals with full diplomatic privileges and immunities—and Dr. Moncada's listed title (Attaché) on the Kardex.

**B.     Children Born in the United States to Foreign Diplomats With Diplomatic Agent Level Privileges and Immunities at the Time of their Birth Do Not Acquire United States Citizenship at Birth**

144.   "There are 'two sources of citizenship, and two only: birth and naturalization.'" *Miller v. Albright*, 523 U.S. 420, 423 (1998) (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898).

145.   "Within the former category, the Fourteenth Amendment of the Constitution guarantees that every person 'born in the United States, and *subject to the jurisdiction thereof*, becomes at once a citizen of the United States, and needs no naturalization.'" *Id.* at 423-24 (quoting *Wong Kim Ark*, 169 U.S. at 702) (Emphasis added).

146.   There is no evidence before the Court that Plaintiff obtained citizenship through naturalization.

147.   Children born in the United States to parents who possessed diplomatic agent level privileges and immunities at the time of their birth are not born subject to the jurisdiction of the United States and, as a result, do not acquire citizenship at birth. *See Wong Kim Ark*, 169 U.S. at 693 ("The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers. . ."); *see also Muthana*, 985 F.3d 893 at 911 ("[Plaintiff's daughter] was not born a United States citizen because her father possessed diplomatic immunity when she was born and therefore she was not born subject to the jurisdiction of the United States.").

148.   In 1790, Congress passed An Act for the Punishment of Certain Crimes Against the United States, Ch. IX § 25, 1 Stat. 112, 117-18 (April 30, 1790) ("1790 Statute") (codified at 22 U.S.C. § 252-254) (repealed 1978)).

149.   The 1790 Statute applied to foreign diplomats, including Plaintiff's father, in 1950, at the time of Plaintiff's birth.  This immunity extended to Plaintiff at the time of his birth.

150.   Section 25 of the 1790 Statute enacts that "if any writ or process shall at any time be sued forth or prosecuted by any person or persons in any of the Courts of the United States, or in any of the Courts of a particular state . . . whereby the person of any ambassador, or other public minister, of any foreign prince or state, authorized and received as such by the President of the United States, or any domestic or domestic servant of any such ambassador or other public minister, may be arrested or imprisoned, or his or their goods or chattels be distrained, seized, or attached, such writ or process shall be deemed and adjudged to be utterly null and void, to all intents and purposes whatsoever. . ."  *Id.* § 25*; see also U.S. v. Ortega*, 24 U.S. 467, 469 n.a (1826).  Thus, under the 1790 Statute, the United States afforded full diplomatic privileges and immunities to accredited foreign diplomatic agents.

151.   The 1790 Statute applied to foreign diplomats (such as Plaintiff's father) at the time of Plaintiff's birth on July 6, 1950.

152.   The 1790 Statute, consistent with well-established international law, conferred the same privileges and immunities enjoyed by the foreign diplomat to the individuals who comprised the foreign diplomat's household, including their children. (". . .whereby the person of any ambassador or other public minister of any foreign prince or state, authorized and received as such by the President of the United States, or any *domestic or domestic servant* of any such ambassador or other public minister. . .) *Id.* § 25 (Emphasis added); *Carrera*, 174 F.2d at 498 ("The same immunity is not only given to an ambassador himself, but to his subordinates, family and servants as well.").

29.

153.   The 1790 Statute was replaced by the Diplomatic Relations Act of 1978 (the "1978 Statute"), 22 U.S.C. §§ 254a-254e.  The 1978 Statute applies to foreign diplomats serving in the United States today.

154.   "Pursuant to the [1978 Statute,] the governing law in the United States on the issue of diplomatic privileges and immunities is the Vienna Convention on Diplomatic Relations."  (the "VCDR").  *Raya v. Clinton*, 703 F. Supp 2d 569, 576 (W.D. Va. 2010) (quoting *Tabion v. Mufti*, 73 F.3d 535, 538 (4th Cir. 1996).

155.   The VCDR "codified longstanding principles of customary international law with respect to diplomatic relations . . . [and] the Convention recognized no exceptions to mission inviolability."  *767 Third Ave. Assocs. v. Permanent Mission of the Republic of Zaire*, 988 F.2d 295, 300 (2d Cir. 1993).  *See also* Rosalyn Higgins, Editorial Comment, *The Abuse of Diplomatic Privileges and Immunities: Recent United Kingdom Experience,* 79 Am.J.Int'l L. 642 (1985) (The Vienna Convention "is agreed to be largely confirmatory of existing customary law.")

156.   Article 31 of the VCDR dictates that, *inter alia*, "A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. . ." VCDR art. 31.  Articles 29-36 outline the criminal, civil, and administrative immunity afforded to accredited diplomatic agents.  *See* VCDR arts. 29-36.

157.   Article 37 states that "The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36."  VCDR art. 37.

158.   Article 39 states that "Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed."  Article 39 further clarifies that "When the functions of a person enjoying privileges and immunities have come to an end, such privileges and

immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so . . ."

159.   Article V, Section 15 of the U.N. Headquarters Agreement dictates that: "such resident members of their staffs [missions to the United Nations] as may be agreed upon between the Secretary-General, the Government of the United States, and the Government of the Member concerned; . . . shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it. . ." U.N. Headquarters Agreement, Art. V, §15(2)-(4).

160.   Consistent with the 1790 Statute and the Vienna Convention (as set forth in in the 1978 Statute), when the United States affords diplomatic agent level privileges and immunities, it extends the same privileges and immunities to the diplomat's children. *See e.g., Muthana*, 983 F.3d at 888-89; *Carrera*, 174 F.2d at 498.

161.   As noted *supra*, the Court concludes that Defendant has put forth clear and convincing evidence that Plaintiff's father was afforded diplomatic agent level privileges and immunities as a result of his position as Attaché at the Permanent Mission to the United Nations from April 27, 1950 to March 18, 1955. (*See* Exs. 1-5; Tr. 33:8-34:2.)  Plaintiff was born on July 6, 1950.  (*See* SF 3, Ex. 12.)  Plaintiff was thus born during the period in which Plaintiff's father and the family members forming his household possessed diplomatic agent level privileges and immunities.

162.   Plaintiff possessed diplomatic agent level privileges and immunities at the time of his birth.  As a result, Plaintiff was not born subject to the jurisdiction of the United States.

163.    Plaintiff did not acquire citizenship at birth.

164.   Defendant has demonstrated by clear and convincing evidence that Plaintiff is not a U.S. citizen.

165.    Thus, Plaintiff is not entitled to a judgment declaring him to be a national of the United States.

166.    Any Conclusion of Law which is properly deemed a Finding of Fact shall be considered a Finding of Fact.

167.    Defendant shall file a Proposed Judgment in accordance with these findings within 14 days.

## **CONCLUSION**

The job of the district court is straightforward: Apply the law to the facts.   This is what the Court has done.  It is seldom appropriate to say anything more—but this case is extraordinary.

A child was born in America and told by the United States government—his government—that he was an American citizen.  And, as the Court began this Order by noting, it told him this again and again and again and again.  No surprise then, that he lived his entire life that way.

When the government finally realized it had been wrong all along, it told Plaintiff that he was not an American citizen and that this was not his home.  So where is his home?  Not Nicaragua because he has never lived there and because—as a direct result of the government's errors—he is not (so far as the Court is aware) a citizen.  Not America.  Anywhere?  Can he leave the United States?  Could he return?  Will he be deported?  To where? What is he supposed to do? As he nears

seventy the government has made his life a nightmare.[4]

It is impossible to conclude that this is justice.   Defendant has no legal obligation to make right what is wrong.  But *anyone* who causes this gravity of harm possesses an urgent moral obligation to remedy what they have done—and in this Court's humble opinion, the United States government has such an obligation.

**IT IS SO ORDERED.**

Dated:  July 6, 2023

_____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

---

[4] The Court in no way intends to introduce levity to what is a gravely serious situation of the government's making.  But it cannot help but note that that this Order is likely to leave Mr. Moncada in a state of limbo not unlike the predicament faced by the main character in the 2004 film "The Terminal."  *See* THE TERMINAL (Spielberg, 2004).  In the film, Viktor Navorski, traveling from the fictional country of Krakozhia, finds himself stuck in a New York City airport as a coup d'etat rages in his home country.  Because the U.S. government does not recognize the new government, Navorski's passport is seized, and he is left to wander a single airport terminal; he cannot enter the United States and he cannot leave.  That, though, is a movie—the uncertainty facing Mr. Moncada is real.

33.